IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

## DAVID BURROWS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 11-04221      John W. Campbell, Judge

_____

### No. W2019-00961-CCA-R3-PC
_____

The Petitioner, David Burrows, appeals from the Shelby County Criminal Court's denial of post-conviction relief from his convictions for first degree premeditated murder, first degree felony murder, and especially aggravated kidnapping. On appeal, the Petitioner argues that trial counsel provided ineffective assistance in failing to discover his intelligence quotient ("IQ") of 76 and in failing to seek a mental evaluation. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Phyllis L. Aluko, District Public Defender; Harry E. Sayle III (on appeal), and Erim Sarinoglu (at hearing), Assistant Public Defenders, for the Petitioner, David Burrows.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The Shelby County Grand Jury indicted the Petitioner for one count of first degree premeditated murder, one count of first degree felony murder, and one count of especially aggravated kidnapping stemming from the May 2011 murder of the Petitioner's estranged girlfriend, Marquita Adams. State v. David Burrows, No. W2014-01785-CCA-R3-CD, 2016 WL 154728, at *1 (Tenn. Crim. App. Jan. 12, 2016), perm. app. denied (Tenn. May 6, 2016).

The evidence presented at the Petitioner's trial showed that the Petitioner and the victim had a tumultuous and abusive relationship. Id. In February 2011, the victim applied for an order of protection against the Petitioner after he gave her a black eye, but the case was dismissed when the victim failed to appear at the hearing. Id. Around the same time, the Petitioner sent the victim a threatening text, stating, "I'm going to kill you, you're not going to see the summertime, and I can't live without you." Id. On May 14, 2011, the Petitioner answered the victim's cell phone and heard the voice of another man, who mocked him. Id. The Petitioner took the victim's car keys and cell phone, and when the victim tried to retrieve them, the Petitioner pushed the victim and told her to "shut up before I kill your kids[,] too." Id. The Petitioner then drove the victim to an area in front of New Chicago Park, where they argued. Id. at *2. When the victim again attempted to retrieve her cell phone, the Petitioner became angry and struck her in the face, and the victim fell to the ground. Id. The Petitioner testified at trial that he repeatedly kicked the victim in her head and all over her body. Id. He also testified that he picked up the victim and hit her again, and when he did so, the victim "fell straight back and hit the curb." Id. The Petitioner said that when he realized the victim was unconscious, he stopped kicking her and attempted to awaken her. Id. When he was unable to rouse her, the Petitioner picked up the victim and placed her on the grass, where she vomited. Id. The Petitioner grabbed the victim, placed her in the trunk of her car, and attempted to stop the bleeding from the victim's head. Id. He then placed the victim in the backseat of the car. Id. The victim began breathing quickly and deeply, and when she stopped breathing, the Petitioner closed the car door and started running. Id. However, he quickly returned to the car, picked up the victim's shoes that had come off during the beating, put them in the car, and drove to his grandmother's home. Id. He parked the car and ran into a nearby park. Id. The Petitioner then got rides to two acquaintances' homes before asking his cousin to take him to a friend's house. Id. He stayed with this friend for two days and then called another cousin to take him to another friend's home. Id. Thereafter, the Petitioner traveled to St. Louis, where he stayed with a friend and used another person's Social Security card and birth certificate to obtain a Missouri state identification. Id. Using this identification, the Petitioner purchased a one-way plane ticket to Alaska, where he was arrested a month and a half later. Id.

The jury convicted the Petitioner as charged. Id. The trial court merged the first degree felony murder conviction with the first degree premeditated murder conviction and imposed an effective sentence of life imprisonment plus twenty-five years. Id. This court affirmed the Petitioner's convictions on direct appeal, and the Tennessee Supreme Court denied permission to appeal. Id. at *1, *8.

On March 31, 2017, the Petitioner filed a timely pro se petition for post-conviction relief, alleging, in part, that he had received ineffective assistance of counsel. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition,

which included the claim that trial counsel was ineffective in failing to investigate his presence at the Tall Trees Juvenile Detention Facility and in failing to seek a mental evaluation to determine his IQ, mental health history, and his competency to stand trial.

At the March 22, 2019 evidentiary hearing, the trial court admitted, pursuant to the parties' stipulation, a February 12, 1998 psychological evaluation of the Petitioner for the juvenile court. The evaluation noted that the Petitioner had been expelled from ninth grade for a disorderly conduct charge, that the Petitioner had repeated third grade, and that the Petitioner had not taken any resource classes at school. It also stated that the Petitioner's history was "reportedly negative for any serious medical or psychological treatment." This evaluation stated that as a result of testing, the Petitioner "obtained an estimated IQ of 76, which falls within the Borderline Mentally Retarded range of intellectual functioning."

At the post-conviction hearing, the Petitioner testified that he was twelve or thirteen years old when he entered the juvenile system. He said that while in the juvenile system, he saw numerous doctors, who showed him "pictures and numbers" and said that he was "crazy." The Petitioner stated that his mental health deteriorated when someone robbed his grandmother and put a knife to his neck when he was nine years old. He asserted that this robbery made him "[m]ad" because no one helped them.

The Petitioner claimed that he "didn't know what was going on" during his criminal case. He said that he was confused about the legal process and his options during his case. The Petitioner said he only understood his choices and options after his "trial was over."

The Petitioner acknowledged that he was expelled from school in the ninth grade for drug use and then went to the Tall Trees Juvenile Detention Facility. He said he did not remember ever receiving a mental health diagnosis.

The Petitioner admitted that after murdering the victim, he picked up the victim's shoes, put them in his vehicle, fled to his grandmother's home and to the homes of several friends, and then traveled to Alaska. He further admitted that he procured a fake identification in Missouri by using someone else's birth certificate and Social Security card before flying to Alaska.

Trial counsel testified that he had been practicing exclusively criminal defense for fourteen or fifteen years when the Petitioner first retained him. He said that with all of his clients, he generally conducted an intake interview, where he gathered information about a client's background, educational history, juvenile record, and past mental health issues. Trial counsel asserted that he always asked his clients if they had "any mental

health treatment" or if they had "any mental health issues" and asked his clients' family members whether the clients had any mental health issues. He said that in this case, he would have talked with May Wright, the Petitioner's grandmother, about whether the Petitioner "had any mental health issues or history[.]" Trial counsel asserted that whenever there is a history or any indication of mental health issues, he "definitely request[s] a mental evaluation."

Trial counsel recalled completing the intake evaluation for the Petitioner at the jail, and his notes from this interview were admitted into evidence. These notes indicated that the Petitioner obtained a GED while previously incarcerated, that the Petitioner had attended an after-school "task force" for help in reading, and that the Petitioner had attended barber school for approximately one month. Trial counsel acknowledged that his notes did not show that he questioned the Petitioner about his mental health; however, he said that the absence of any information in his notes about the Petitioner's mental health indicated that the Petitioner had provided no information on that topic.

Trial counsel said he asked the Petitioner about his juvenile record and discovered that the Petitioner had been sent to "Tall Trees" for two or three months when he was sixteen before going to the Shelby Training Center for three months. He noted that the Petitioner was sent to both "Tall Trees" and the Shelby Training Center for his drug use. There was nothing in trial counsel's file to indicate that he investigated what sort of program "Tall Trees" was.

Trial counsel acknowledged that he did not investigate the Petitioner's "family file" from juvenile court, which generally gives "a synopsis of all encounters with the juvenile system" and provides "general information about the [juvenile's] family." Although trial counsel admitted that he did not conduct any outside investigation regarding whether any members of the Petitioner's family had mental health issues, he said he talked to several members of the Petitioner's family and discovered no significant mental health issues or mental disorders. Trial counsel insisted that he would have followed up on any information regarding the Petitioner's mental health and would have noted such in his file.

Trial counsel said he provided the Petitioner with a copy of all the discovery in his case. He said that did not ask the Petitioner about his reading level but asserted that he did not recall his reading level being an issue.

Trial counsel said that he had represented clients in several felony and murder trials prior to handling the Petitioner's first degree murder trial and that during these other cases, he had evaluated the clients' mental health issues. He asserted that if there had been evidence or anything indicating that there were mental issues present in his cases,

then he obtained a mental health evaluation. He stated that he pursued mental health issues in several of his murder cases. Trial counsel affirmed that at the time he represented the Petitioner, he was familiar with requesting expert services under Tennessee Supreme Court Rule 13 and had requested expert services several times in other cases. He also said he had presented a diminished capacity defense prior to handling the Petitioner's case. Trial counsel said that if he had believed he needed expert services in the Petitioner's case, he "would have absolutely petitioned the Court for funding[.]"

Trial counsel asserted that it was apparent that the Petitioner had been sent to Tall Trees Juvenile Detention Facility for his drug usage, and he did not further investigate the Petitioner's time there because there was nothing that indicated that the Petitioner suffered from a mental illness. Trial counsel said he was aware that the Petitioner earned a GED while previously incarcerated at the Shelby County Correctional Center and that the Petitioner had attended barber college.

Trial counsel stated that the facts of the Petitioner's case indicated that the Petitioner had a sophisticated degree of functioning. Given his interactions with the Petitioner and the facts of the Petitioner's case, trial counsel did not believe that he would have been successful in pursuing a mental health defense. He asserted that the Petitioner's conduct during the crimes did not indicate that he had a mental defect or disease because it involved executing a plan that "required some degree of higher thinking." He explained that after murdering the victim, the Petitioner hid in several locations, made several calls to family members expressing his remorse for his actions, obtained a fake identification, and flew to Alaska.

Trial counsel said the 1998 psychological evaluation, which was admitted during the hearing, showed that the Petitioner had not undergone any serious medical or psychological treatment. He acknowledged that this evaluation provided an estimated IQ for the Petitioner of 76, which placed him in the "Borderline Mentally Retarded range of intellectual functioning." Trial counsel candidly admitted that had he seen this psychological evaluation, he "probably would have requested a mental evaluation[.]" However, he saw nothing in the psychological evaluation that would have assisted him in arguing a diminished capacity defense or any other mental health defense on behalf of the Petitioner. He also did not believe that a mental evaluation of the Petitioner would have changed the outcome of the case. Trial counsel said that he talked to several members of the Petitioner's family and that no one ever indicated that the Petitioner had any mental health issues or mental defects. He reiterated that there was nothing in this case that made him believe that the Petitioner had mental health issues that would have assisted trial counsel in presenting a defense to the jury.

Trial counsel acknowledged that his defense theory, which he presented during his closing argument, focused on the Petitioner's mental state at the time of the offense. He argued that the Petitioner did not act with premeditation and was only guilty of a lesser included offense. He also contended that the incident was a "domestic violence situation that got out of hand" and that "when [the victim] fell to the ground, she hit her head on the curb." Trial counsel maintained that the Petitioner fled the scene because he was panicked, not because he was trying to escape a murder charge.

On April 29, 2019, the post-conviction court entered a written order denying relief. In it, the court noted that "[t]he [P]etitioner has submitted no witnesses who would have provided testimony that would have changed the outcome of the trial." The court also found trial counsel to be "very credible" and asserted that it would "not second guess trial strategy unless it is unreasonable and not based on adequate preparation." The court then made the following findings of fact and conclusions of law regarding the Petitioner's claim that trial counsel failed to investigate his mental health:

> As to the allegation that [trial counsel] did not explore whether there were any mental health issues that could have been submitted to the jury to show diminished capacity, the Court finds that counsel did examine whether any mental health issues were present in the [P]etitioner's case and determined that there was nothing useable. Counsel talked to the [P]etitioner who provide[d] no useful information. [Trial counsel] went further and interviewed the family and they provided no information that would have been useful for any mental defense. [Trial counsel] testified that he explored these issues and could find no indication of mental disease or defect. The investigation revealed that the [P]etitioner had not been diagnosed with any mental illnesses and had not been in resource classes in school. Furthermore, when the [P]etitioner was incarcerated in an earlier case he obtained his GED which would severely undercut an argument that the defendant was suffering from some kind of intellectual disability. Even though counsel did not obtain the juvenile court file and was unaware that the [P]etitioner scored an IQ of 76, there has been no showing that this information would have been useful at trial. The fact that the [P]etitioner had been incarcerated at "Tall Trees" for drug use as a juvenile in and of itself does not give rise to any significance without further context. The [P]etitioner has not provided any further context to show that not exploring this fact created some kind of prejudice. The [P]etitioner has provided no proof that there was any additional information that could have been developed that would have changed the outcome of the trial. By his failure to specifically allege and prove that additional evidence existed and could have been developed had counsel pursued this avenue, the Court finds that

the [P]etitioner has failed to meet his burden of proof. Petitioner has the burden to establish his claims for relief. The Court will not assume what is not in evidence. Since the [P]etitioner has the burden of proving his case, and there being no proof to contradict the decision by trial counsel, this allegation is without merit. Grindstaff v. State, 279 S.W.3d 208 (Tenn. 2009).

. . . .

After a review of all the allegations . . . and a review of the trial record and the proof adduced at the evidentiary hearing, the Court finds that the [P]etitioner has not met his burden of showing counsel was deficient[,] much less that there was prejudice.

Thirty-one days after entry of the order denying post-conviction relief, the Petitioner filed his notice of appeal.

## ANALYSIS

The Petitioner argues that trial counsel provided ineffective assistance in failing to discover that he had an IQ of 76 and in failing to request a mental evaluation. The State responds that the Petitioner is not entitled to relief because trial counsel found no suggestion of mental disability and because the Petitioner has failed to show how discovering the psychological evaluation would have changed the outcome of his case. We conclude that the Petitioner is not entitled to relief.

Although not raised by either party, we note that the Petitioner's notice of appeal is untimely. Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from . . . ." However, it also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Here, the Petitioner filed his notice of appeal on May 30, 2019, thirty-one days after entry of the order denying post-conviction relief. The Petitioner fails to provide an explanation for this untimely filing. Nevertheless, given that the notice of appeal was untimely by only one day, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998). Accordingly, we will review this appeal on the merits.

- 7 -

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff, 297 S.W.3d at 216; Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

Here, the Petitioner argues that trial counsel provided ineffective assistance in failing to discover that he had an IQ of 76 and in failing to request a mental evaluation. In particular, the Petitioner claims trial counsel should have uncovered his 1998 psychological evaluation conducted at the Tall Trees Juvenile Detention Facility, which stated that he had "an estimated IQ of 76" and that he was in the "Borderline Mentally Retarded range of intellectual functioning." He also claims that trial counsel should have talked to the Petitioner's family and friends about his mental condition. The Petitioner, noting that trial counsel's defense theory was that the Petitioner lacked the intent required for first degree murder, argues that evidence regarding his mental condition was "germane to that defense" and "would have substantially bolstered support for the argument in favor of a lesser[]included offense." The Petitioner emphasizes that trial counsel not only admitted that he did not investigate his mental health but also acknowledged that had he known of the 1998 psychological evaluation, he probably would have requested a mental evaluation.

The evidence presented at the post-conviction hearing established that trial counsel was an experienced criminal defense attorney, who routinely requested mental evaluations and expert services and who had presented a diminished capacity defense prior to representing the Petitioner. Trial counsel testified that he spoke to the Petitioner and the Petitioner's family and that no one provided any information that the Petitioner had any mental health issues or mental defects. Trial counsel said he knew that the Petitioner had been sent to the Tall Trees Juvenile Detention Facility for drug use and did not further investigate the Petitioner's time there because there was nothing during his investigation that indicated that the Petitioner suffered from a mental illness. He was aware that the Petitioner had earned his GED while previously incarcerated and that the Petitioner had attended barber college. He also believed that the Petitioner's conduct following the victim's murder, which included hiding in several locations, expressing his remorse to several family members, and obtaining a fake identification before flying to Alaska, indicated a sophisticated degree of functioning. In light of the Petitioner's background and conduct, he felt that a mental health defense would not be successful. Trial counsel admitted that he probably would have requested a mental evaluation if he had seen the 1998 psychological evaluation; however, he asserted that he did not believe that the psychological evaluation would have assisted him in arguing a diminished capacity defense or other mental health defense. He also said he did not believe that a mental evaluation would have changed the outcome of the Petitioner's case. Trial counsel insisted that if there had been any indication that the Petitioner had mental issues or mental disorders, he would have petitioned the trial court for funding for an expert and would have obtained a mental evaluation of the Petitioner.

In its order denying relief, the post-conviction court found trial counsel "very credible" and noted that it would not second guess an attorney's trial strategy unless it

was unreasonable or was not based on adequate preparation. The court determined that trial counsel had talked to the Petitioner and the Petitioner's family, who provided no information useful to a mental defense, and that upon exploring this issue, trial counsel could find no other indication of a mental disease or defect. In addition, the court recognized that the Petitioner had never been diagnosed with any mental illnesses, had not been in resource classes at school, and had obtained his GED while previously incarcerated, which "severely undercut an argument that the [Petitioner] was suffering from some kind of intellectual disability." Most importantly, the post-conviction court found that although trial counsel was unaware that the Petitioner had an estimated IQ of 76, "there ha[d] been no showing that this information would have been useful at trial." The record shows that trial counsel's conduct did not fall below an objective standard of reasonableness under prevailing professional norms. Accordingly, we conclude that the Petitioner failed to establish that trial counsel was deficient in not discovering his IQ and in not requesting a mental evaluation.

Even if we had concluded that trial counsel was deficient, the Petitioner has failed to establish that he was in any way prejudiced by trial counsel's alleged deficiencies. The Petitioner's argument specifically focuses on his claim that trial counsel's deficiencies prevented him from presenting a diminished capacity defense. Diminished capacity is "a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." State v. Phipps, 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994) (citing Gayle Cohen, Johnson v. State– Diminished Capacity Rejected As A Criminal Defense, 42 Md. L. Rev. 522, 524 (1983)). While proof of an individual's diminished capacity does not excuse or defeat a criminal charge, such proof may be relevant and admissible to rebut the requisite mens rea for an offense. Nesbit v. State, 452 S.W.3d 779, 798 (Tenn. 2014) (citing Phipps, 883 S.W.2d at 143). In essence, diminished capacity "is an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but may well be guilty of a lesser one." Phipps, 883 S.W.3d at 143 (citing United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990)).

Although the Petitioner presented the 1998 psychological evaluation stating that he had an estimated IQ of 76, the Petitioner failed to prove the feasibility of a mental impairment defense. The post-conviction court aptly recognized the fact that the Petitioner had been sent to the Tall Trees Juvenile Facility for drug use as a juvenile "in and of itself does not give rise to any significance without further context" and that the Petitioner had failed to show how "not exploring this fact created some kind of prejudice." In addition, the court held that the Petitioner had failed to provide any proof that there was information that could have been developed that would have changed the outcome of trial, and the record fully supports this conclusion. The Petitioner only presented the two-page psychological evaluation and presented no witnesses in support of

a mental impairment defense.  When a petitioner alleges deficient investigation by counsel, he or she must present evidence that proves what further investigations would have uncovered in order to establish prejudice.  See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).  Neither the post-conviction court nor this court "can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel."  Id. at 757.  Because the Petitioner did not show what further investigation of his mental health would have revealed, he has failed to prove prejudice.  We also conclude that the details of the Petitioner's crimes were indicative of premeditation and that the Petitioner's conduct following the victim's death showed a particularly sophisticated degree of functioning.  Accordingly, there is no reasonable probability that, had trial counsel discovered the Petitioner's IQ or requested a mental evaluation, the outcome of the Petitioner's case would have been different.  Because the Petitioner has failed to establish that that trial counsel's performance was deficient and prejudicial, he is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and analysis, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE